

FILED

FEB 13 2025
2-13-2025

Judge Jeffrey I. Cummings
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ADVANCED INVENTORY
MANAGEMENT, INC.

No. 25 CR 18-1

Judge Jeffrey I. Cummings

## DEFERRED PROSECUTION AGREEMENT

Defendant Advanced Inventory Management, Inc. (the "Company") and the United States Attorney's Office for the Northern District of Illinois (the "Office") hereby enter into this Deferred Prosecution Agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1. The Company acknowledges and agrees that the Office will file the attached one-count criminal Information in the United States District Court for the Northern District of Illinois charging the Company with one count of misbranding of a medical device with the intent to defraud, in violation of Title 21, United States Code, Sections 331(k) and 333(a)(2). In doing so, the Company knowingly (a) waives its right to indictment on this charge, as well as all rights on this charge to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) knowingly waives any objection with respect to venue to any charges brought by the Office arising out of the conduct described in the Statement of Facts attached as Attachment A ("Statement of Facts") and consents to the filing of the Information, as

1

provided under the terms of this Agreement, in the United States District Court for the Northern District of Illinois; and (c) knowingly waives the right to have the criminal charge in the Information brought within the statute of limitations, which is within five years of the last of the alleged acts constituting the specified violation, and waives any defense or claim based on the statute of limitations or upon the timeliness with which the charge in the Information was brought.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. The Company agrees that, effective as of the date the Company signs this Agreement, it will not dispute the Statement of Facts in any prosecution brought as a result of a breach of this Agreement and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), or any other federal rule, that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

2

## Term of the Agreement

3. This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term"). The Company agrees, however, that, in the event the Office determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Office, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Office's right to proceed as provided in Paragraphs 19 to 22 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment C, for an equivalent period. Conversely, in the event the Office finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment C, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

4. If the Court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 316l(h)(2), the Term shall be deemed to have not begun, and all the provisions of this Agreement shall be deemed null and void, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months, and except for the provisions contained within Paragraph 2 of this Agreement.

## Relevant Considerations

5.     The Office enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including the nature and seriousness of the offense conduct, the lack of any criminal history on the part of the Company, the Company's cooperation as described below, and the compliance measures as described below.

## Future Cooperation and Disclosure Requirements

6.     The Company shall cooperate fully with the Office in any and all matters relating to the conduct described in the Statement of Facts and other conduct under investigation by the Office at any time during the Term, subject to applicable laws and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Office, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, in any investigation of the Company, its parent company, its subsidiaries, or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Office.

7.     The Company's cooperation is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Office a log of any information or

4

cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such assertion.

8. The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

a. The Company shall truthfully disclose all factual information with respect to its activities, those of its affiliates, and those of its present and former officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Office, upon request, any document, record or other tangible evidence about which the Office may inquire of the Company.

b. Upon request of the Office, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Office the information and materials described in the paragraph above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c. The Company shall use its best efforts to make available for interviews or testimony, as requested by the Office, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and

regulatory authorities. Cooperation under this paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Office pursuant to this Agreement, the Company consents to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Office, in its sole discretion, shall deem appropriate.

9.     In addition to the obligations described above, during the Term, should the Company learn of any evidence or allegation of conduct that may constitute a violation of the Federal Food, Drug, and Cosmetic Act provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Office.

## Payment of Monetary Penalty

10.     The Office and the Company agree that application of the 2023 Sentencing Guidelines manual to determine the applicable fine range yields the following analysis:

*Offense Level*

a.    Based upon U.S.S.G. § 2N2.1, the total offense level is 20, calculated as follows:

| | |
|---|---|
| § 2N2.1(a) | 6 |
| §§ 2N2.1(c)(1) & 2B1.1(b)(1)(G)<br>Loss of more than $250,000 but less than $550,000 | 12 |
| § 2B1.1(b)(10)(B)<br>Conduct occurred outside the United States | 2 |
| **TOTAL** | **20** |

*Base Fine*

b.    Based upon U.S.S.G. § 8C2.4(a)(1) and (d), an offense level of 20 results in a base fine is $1,000,000.

*Culpability Score*

c.    Based upon U.S.S.G. § 8C2.5, the culpability score is 5, calculated as follows:

| | |
|---|---|
| (a), base culpability score | 5 |
| (b)(4), the organization had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense | 2 |
| (g)(3), the organization clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -1 |
| **TOTAL** | **6** |

*Calculation of Fine Range*

7

d. Pursuant to U.S.S.G. § 8C2.6, a culpability score of 6 results in a minimum multiplier of 1.20 and a maximum multiplier of 2.40, which in combination with a base fine of $1,000,000, results in a fine range of $1,200,000 to $2,400,000.

11. The Company agrees to pay a total monetary penalty in the amount of $1,000,000 (the "Total Criminal Penalty"). This reflects a 16.7% discount off the bottom of the applicable Sentencing Guidelines fine range. The Total Criminal Fine will be paid to the Department of Justice pursuant to the following schedule: (a) $250,000 will be paid within 90 days of the date the Company signs this Agreement (the "Execution Date"); (b) a second $250,000 payment will be due on or before 180 days after the Execution Date; (c) a third $250,000 payment will be due on or before 270 days after the Execution Date; and (d) a fourth $250,000 payment will be due on or before one year after the Execution Date. The Company and the Office agree that this penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described above. The Total Criminal Fine is final and shall not be refunded. Furthermore, nothing in his Agreement shall be deemed an agreement by the Office that the Total Criminal Penalty is the maximum penalty that may be imposed in any future prosecution, and the Office is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Office agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total

8

Criminal Penalty. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

## Conditional Release from Liability

12.    Subject to Paragraphs 19 to 22, the Office agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company relating to any of the conduct described in the Statement of Facts or the criminal Information filed pursuant to this Agreement. The Office, however, may use any information related to the conduct described in the Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; or (b) in a prosecution for making a false statement.

13.    This Agreement does not provide any protection against prosecution for any future conduct by the Company. In addition, the Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

## Corporate Compliance Program

14.    The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the Federal Food, Drug, and Cosmetic Act, including, but not limited to, the minimum elements set forth in Attachment B.

15. In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of their existing internal accounting controls, policies, and procedures, regarding compliance with the Federal Food, Drug, and Cosmetic Act. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the Federal Food, Drug, and Cosmetic Act and other applicable anti-corruption laws. The compliance program, including the internal accounting controls system will include, but not be limited to, the minimum elements set forth in Attachment B.

### Corporate Compliance Reporting

16. The Company agrees that it will report to the Office annually during the Term regarding remediation and implementation of the compliance measures described in Attachment B. These reports will be prepared in accordance with Attachment C.

## Deferred Prosecution

17. In consideration of the undertakings agreed to by the Company herein, the Offices agrees to request that the United States District Court for the Northern District of Illinois defer proceedings on the charge in the information for the Term of this Agreement.

18. The Office further agrees that if the Company fully complies with all of its obligations under this Agreement, the Office will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within six months after the Agreement's expiration, the Office shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts. If, however, the Office determines during this six-month period that the Company breached the Agreement during the Term, as described below in Paragraphs 19 to 22, the Office's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including as described in Paragraph 19, remain in full effect.

## Breach of the Agreement

19. If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as required under this

11

this Agreement; (d) fails to implement a compliance program as set forth in this Agreement and Attachment B; (e) commits any acts that, had they occurred within the jurisdictional reach of the federal Food, Drug, and Cosmetic Act, would be a violation of the Federal Food, Drug, and Cosmetic Act; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Office becomes aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Office in the United States District Court for the Northern District of Illinois or any other appropriate venue.

20. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Office's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Office prior to the date on which this Agreement was signed that is not time barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of

12

this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Office is made aware of the violation or the duration of the Term plus one year, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

21.    In the event the Office determines that the Company has breached this Agreement, the Office agrees to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Office shall consider in determining the appropriate remedy, including whether to pursue prosecution of the Company.

22.    In the event the Office determines that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Office or to the Court, including the Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement shall be admissible in evidence in any and all criminal proceedings brought by the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of

13

Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Office.

23. The Company acknowledges that the Office has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment. The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

24. On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Operating Officer of the Company, will certify to the Office, in the form of executing the document attached as Attachment D to this Agreement, that the Company has met its disclosure obligations pursuant to Paragraphs 6 to 9 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

14

## Sale, Merger, or Other Change in Corporate Form of Company

25.    Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Office's ability to determine a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void.

26.    The Company shall provide notice to the Office at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Office shall notify the Company prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement.

27.    Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or

other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement.

## Public Statements by Company

28.     The Company expressly agrees that it shall not, through present or future attorneys, officers, employees, agents or any other person authorized to speak for the Company, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 19 to 22 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Office. If the Office determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Office shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This

16

paragraph does not apply to any statement made by any present or former officer, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

29. The Office agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Office is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

### Limitations on Binding Effect of Agreement

30. This Agreement is binding on the Company and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

### Notice

31. Any notice to the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, Financial Crimes Section, United States Attorney's Office,

17

Northern District of Illinois, 219 S. Dearborn Street, Suite 500, Chicago, Illinois 60604. Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief Operating Officer, Advanced Inventory Management, Inc., 9645 W. Willow Lane, Mokena, Illinois 60448, or by electronic mail to those individuals or to other counsel or individuals identified to the Office by the Company. Notice shall be effective upon actual receipt by the Office or the Company.

### Complete Agreement

32.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Office. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, the attorneys for the Company, and a duly authorized representative of the Company.

**AGREED:**

**FOR ADVANCED INVENTORY MANAGEMENT, INC.:**

Date: _02/06/25_      BY: _____

Philip Sylvester
Chief Operating Officer
Advanced Inventory Management, Inc.

Date: _2/6/2025_      BY: _____

Greg Marshall
Erin Sullivan
Bradley Arant Boult Cummings LLP
Counsel for Advanced Inventory
Management, Inc.

**FOR THE UNITED STATES ATTORNEY'S OFFICE, NORTHERN DISTRICT OF ILLINOIS**

MORRIS PASQUAL
Acting United States Attorney
Northern District of Illinois

Date: _2-6-25_      BY: _____

Jared Hasten
Assistant United States Attorney

19

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Advanced Inventory Management, Inc. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. I have carefully reviewed the terms of this Agreement with management of the Company. I have advised and caused outside counsel for the Company to advise management fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement. No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Chief Operating Officer for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: _02/06/25_          BY: _____

Philip Sylvester
Chief Operating Officer
Advanced Inventory Management, Inc.

## CERTIFICATE OF COUNSEL

I am outside counsel for Advanced Inventory Management, Inc. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company's management. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with management of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement is an informed and voluntary one.

Date: __2/6/2025__          BY: _____
                                Greg Marshall
                                Erin Sullivan
                                Bradley Arant Boult Cummings LLP
                                Counsel for Advanced Inventory
                                Management, Inc.

ATTACHMENT A

**<u>STATEMENT OF FACTS</u>**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Northern District of Illinois (the "Office"), and Advanced Inventory Management, Inc., on behalf of itself and its affiliates (the "Company"). The Company hereby agrees and stipulates that the following information is true and accurate. The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers and employees as set forth below.

1.      The Company is an Illinois-based company with headquarters in Mokena, Illinois. The Company sells discounted medical products, including med-surg products such as sutures, gauges, and other products used in surgical procedures, to surgical centers, physician's offices, and other medical facilities. During the relevant period, Anthony Iaderosa was the sole owner, President, and Chief Executive Officer ("CEO"). In his role as CEO, Iaderosa supervised many of the Company's employees, including those who were responsible for purchasing medical products.

2.      In order to increase profits, the Company's employees, at the direction of Iaderosa, began purchasing medical devices abroad from foreign distributors even though the same medical devices were available for purchase in the United States. The Company purchased the products from abroad because they were cheaper than purchasing the same products in the United States.

A-1

3.     Indeed, although some of the medical devices were available for purchase in the United States, those medical products that had been distributed abroad were not approved by the manufacturers for importation into the United States for the purpose of being resold. As a result, foreign distributors were requested by the manufacturer to label the packaging on these medical products reflecting that the products were not to be sold outside of certain foreign markets.

4.     With respect to the importing of medical products from abroad, the Company's employees had to conceal the fact that these products the Company had purchased were not available for resale in the United States. In particular, the packaging of certain of those medical products included stickers on the outside of the packaging indicating that the product was only available for resale in a given country and, as described further below, employees were instructed to remove those stickers in order to conceal the fact that the products were not available for resale in the United States.

5.     Additionally, when importing medical devices, the carriers hired to ship those products required the recipient to submit a statement of intended use that would be provided to customs agents if asked about the end use of the products. On certain occasions, the Company's employees, with the approval of Iaderosa, falsely attested in those statements of use that the products were not being resold for medical use in the United States, but were instead being used for other purposes, such as for research purposes only. These statements were untrue because the Company

purchased these medical products for the sole purpose of reselling from its business facility in Mokena, Illinois in the United States.

6. When the medical products distributed from international distributors arrived at AIM's facility in Mokena, Illinois, AIM's employees, with the approval of Iaderosa, at times removed stickers from the packaging that indicated that the products were only for resale in a country outside of the United States. For instance, when importing certain medical products from Turkey, the products contained stickers stating that products were not "for resale outside of Turkey." Iaderosa gave his approval to the Company's employees to remove these types of stickers with hair dryers and to remove the residue from the packaging.

7. The Company resold the medical products that it had imported from international distributors after removing stickers from the packaging indicating that the product was only available for resale in an international country. The Company obtained these products internationally at lower prices and sold them to customers in the United States. Because the Company received these products at a cheaper price from international distributors, it was able to sell these medical products and make a higher profit margin than it would have been able to had it purchased the medical products domestically in the United States from a distributor.

8. Between 2016 and 2023, AIM imported medical products that had intended use codes that did not reflect that the medical products would be resold domestically in the United States and AIM then resold those products in the United

States at a substantial markup resulting in profit margins ranging from 35% to 50%. In total, AIM made profits of approximately $500,000 employing this tactic.

9. As a result of removing stickers from the packaging of these medical products, the Company rendered the products misbranded under the Federal Food, Drug, and Cosmetic Act. The Company also deliberately concealed this fact from the FDA, including by causing the removal of stickers from the products and causing false statements to be submitted to customs agents. Further, the Company did not advise the purchasers of these medical products that it obtained the products from overseas and removed a sticker indicating that the products were not, per the manufacturers, available for resale outside of an international locale.

ATTACHMENT B

## **CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Federal Food, Drug, and Cosmetic Act (also referred to as the "Relevant Laws"), Advanced Inventory Management, Inc. on behalf of itself and its affiliates ("the Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including its system of internal controls, its Code of Business Ethics and Conduct, and its compliance policies and procedures, in order to ensure that it maintains an effective system of internal controls as well as policies and procedures designed to effectively detect and deter violations of the Relevant Laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls and compliance program.

*High-Level Commitment*

1.    The Company will ensure that its officers, directors, and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of Relevant Laws and its compliance program.

*Policies and Procedures*

2.     The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the anti-fraud provisions of the Relevant Laws, which policy shall be memorialized in written additions to its compliance program.

3.     The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the Relevant Laws and the Company's compliance program, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the Relevant Laws by personnel at all levels of the Company. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of and at the direction of the Company in a foreign jurisdiction, including but not limited to agents and intermediaries, consultants, representatives, distributors, contractors and suppliers, and joint venture partners (collectively, "authorized agents and business partners"). The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.

*Periodic Risk-Based Review*

4.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company.

5.     The Company shall review its policies and procedures related to anti-fraud provisions of the Relevant Laws no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

6.     The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance program. Such corporate official(s) shall have the authority and obligation to report directly to management, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

7.     The Company will implement mechanisms designed to ensure that its compliance program, including policies related to anti-fraud provisions of the Relevant Laws, is effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

8.    The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance program, including when they need advice on an urgent basis.

*Internal Reporting and Investigation*

9.    The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-fraud provisions of the Relevant Laws and those aspects of the Company's compliance program related thereto.

10.    The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of anti-fraud provisions of the Relevant Laws, and violations of the Company's compliance program.

*Enforcement and Discipline*

11.    The Company will implement mechanisms designed to effectively enforce its compliance program, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

12.    The Company will institute appropriate disciplinary procedures to address, among other things, violations of anti-fraud, reporting, and books and records provisions of the Relevant Laws and the Company's compliance program by the Company's directors, officers, and employees. Such procedures should be applied

consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that, where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing its internal controls and compliance program and making modifications necessary to ensure the overall compliance program is effective.

*Third-Party Relationships*

13. The Company will use appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all its authorized agents and business partners, including:

a. properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b. informing agents and business partners of the Company's commitment to abiding by anti-fraud provisions of the Relevant Laws, and of the Company's compliance program; and

c. seeking a reciprocal commitment from agents and business partners.

14. Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with its authorized agents and business partners that are reasonably calculated to prevent violations of anti-fraud provisions of the Relevant Laws, which may, depending upon the

circumstances, include: (a) anti-fraud representations and undertakings relating to compliance with the Relevant Laws; and (b) rights to terminate an agent or business partner as a result of any breach of anti-fraud provisions of the Relevant Laws, the Company's compliance program, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

15. The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conducts appropriate risk-based due diligence on potential new business entities, including appropriate Federal Food, Drug, and Cosmetic Act due diligence by legal, accounting, and compliance personnel, or persons acting under their supervision.

16. The Company will ensure that the Company's compliance program, policies, and procedures regarding anti-fraud provisions of the Relevant Laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly train the directors, officers, employees, agents, and business partners, on AIM's compliance program.

*Monitoring and Testing*

17. The Company will conduct reviews and testing of its compliance program periodically, and at least once per reporting period, to evaluate and improve its effectiveness in preventing and detecting violations of anti-fraud provisions of the Relevant Laws, taking into account relevant developments in the field and evolving industry standards.

## ATTACHMENT C

## REPORTING REQUIREMENTS

Advanced Inventory Management, Inc. on behalf of itself and its subsidiaries ("AIM" or the "Company"), agrees that it will report to the Office periodically, at no less than twelve-month intervals during a three-year term, regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment B. During this three-year period, the Company shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two follow-up reviews and reports, as described below:

a.       By no later than one year from the date this Agreement is executed, the Company shall submit to the Office a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve the Company's internal controls, policies, and procedures for ensuring compliance with anti-fraud provisions of the Federal Food, Drug, and Cosmetic Act, and the proposed scope of the subsequent reviews. The report shall be transmitted to:

Chief of the Financial Crimes Section
U.S. Attorney's Office
Northern District of Illinois
219 South Dearborn Street
Chicago, IL 60604

The Company may extend the time period for issuance of the report with prior written approval of the Office.

b.       The Company shall undertake at least two follow-up reviews and reports, incorporating the views of the Office on the Company's prior reviews and

C-1

reports, to further monitor and assess whether the Company's policies and procedures are reasonably designed to detect and prevent violations of anti-fraud, reporting, and books and records provisions of the federal securities laws.

c. The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the Office. The second follow-up review and report shall be completed and delivered to the Office no later than thirty days before the end of the Term.

d. The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Office determines in its sole discretion that disclosure would be in furtherance of the Office's discharge of its duties and responsibilities or is otherwise required by law.

e. The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Office.

## ATTACHMENT D

## <u>CERTIFICATION</u>

To:         AUSA Jared Hasten
            United States Attorney's Office
            Northern District of Illinois

Re:         Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to the Deferred Prosecution Agreement ("DPA") filed on February 6, 2025, in the U.S. District Court for the Northern District of Illinois, by and between the Office and Advanced Inventory Management, Inc. (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraphs 6 to 9 of the DPA and that the Company has disclosed to the Office any and all evidence or allegations of conduct required pursuant to Paragraphs 6 to 9 of the DPA, which includes evidence or allegations that may constitute a violation of the Federal Food, Drug, and Cosmetic Act had the conduct occurred within the jurisdiction of the United States ("Disclosable Information"). This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirement contained in Paragraphs 6 to 9 and the representations contained in this certification constitute a significant and important component of the DPA and the Office's determination whether the Company has satisfied its obligations under the DPA. The undersigned hereby certifies respectively that he is the Chief Operating

D-1

Officer ("COO") of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company. This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Northern District of Illinois. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Northern District of Illinois.

Date: __02/06/25__          BY: _____

Philip Sylvester
Chief Operating Officer
Advanced Inventory Management, Inc.